Samuel Dixon Mayhew, petitioner-appellant,

*v.*

Mable Craig Mayhew, defendant-respondent.

[Decided January 25th, 1924.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Leaming, who delivered the following opinion orally.

"I doubt whether there would be any substantial benefits in my taking this case under advisement; I am called upon to pass upon this branch of the law so frequently that I doubt whether any additional reflection in this case would be of any service.

"This case, after all, reduces itself largely to a question of fact, as all cases do where the law can be readily defined, and I think the law can be said to be defined in this case. Of course, in domestic relations varying circumstances are innumerable, and it is difficult to arbitrarily define the law in a manner that will cover all situations; but the principles underlying the decisions I think cover almost every conceivable situation that may arise.

"There is no doubt touching the provisions of our statute to the effect that in order to dissolve a marriage upon the ground of desertion the desertion must not only be continuous for a period of two years and willful for that period but it must also be obstinate during that entire period. Statutory obstinacy has been defined many times, and the definition which appears to have been uniformly accepted is that a desertion is obstinate within the meaning of our statute only when it is of a nature that will resist the will of the deserted party to terminate it; and my observation has long been that the best test and surest test to determine whether the element of obstinacy is to be found in any given desertion is for the deserted party to make at least some real effort to terminate it. In some cases, where it is obvious that any effort upon the part of a deserted party to terminate a desertion would be fruitless, a party may be excused from making any effort to terminate the desertion; but the real inquiry is whether the inherent nature or character of the desertion is such that it resists, or is of a nature that would resist, the will of the deserted party to terminate it.

"It is also held by our court of errors and appeals that the duty to terminate a desertion rests more heavily upon a husband than it does upon a wife, and I have already suggested that the duty of a husband to make some effort to terminate a desertion may not exist at all if circumstances are such that it clearly appears that the effort would be futile; but ordinarily that duty exists unless it is excused by circumstances appearing in the case. The husband must in the absence of adequately excusing circumstances endeavor to procure his wife's return, and if he is at fault at all in the

occasion of the desertion the duty weighs more heavily upon
him than it would in a case where he was not at fault.   But
the duty is ever present unless excused by special circum-
stances, and I think that where the convenient opportunity
exists for the husband to at least request his wife's return,
if he fails to do so he should assume the burden of establish-
ing with entire clearness the fact that it would have been
futile for him to have done so.   It will not suffice to say
that the husband had a natural or even a just grievance on
account of his wife's misconduct in deserting him, or even
that she has failed to adequately support her claim of a griev-
ance by the necessary proofs in a maintenance suit; to be
justified his failure to give some degree of encouragement to
her return must not be based upon his mere disapproval of
her desertion; it must be because any effort on his part to
induce her return would have been clearly futile and un-
availing.

"Now, in this case, so far as I am able to determine, there
has never been an effort upon the part of Doctor Mayhew
to terminate this desertion—to induce his wife to return.
When I say there has never been an effort on his part I mean
anything like such an effort as would naturally and appro-
priately be made by a husband who desired or even sought
to procure the return of his wife, or who sought to have his
wife believe that he desired her return.

"It is true that he claims that when she took the goods
away he told her to stop her nonsense, or something of that
nature, but even by his narration of that incident, which is
differently narrated by his wife, there appeared little, if any,
real effort upon his part to bring about a reconciliation with
his wife.   He knew full well what her grievances were and
yet, so far as has been indicated by the evidence, there was
no word or suggestion on his part that he would make the
slightest effort to remove any unpleasantnesses that existed
or had existed in his home prior to that time.

"At the trial of the maintenance suit which occurred dur-
ing their separation he was asked on the witness-stand if he
was willing for her to return and he answered affirmatively.

To construe that into a real invitation for her return would be going very far. It would no doubt have been destructive of his defense of the then pending suit against him if he had answered in the negative.

"Subsequent to that it is not claimed that he has at any, time performed any act or uttered any word that gave indication of any kind of a purpose on his part to procure his wife's return, or even a willingness to have her return, or a desire that she should think him still willing for her to return. He has, notwithstanding a favorable decision in the maintenance suit, made it easily possible for his wife to stay away. Of course, I do not criticise him for sending his monthly payments to his wife, especially in view of the fact that his child was in her custody and he as a father could not see that child suffer for any misconduct or stubbornness upon the part of the wife, but nevertheless his monthly installments in the form of checks to his wife made it possible for his wife to live away from him—made it possible for his wife to fail to return to him during all of the rest of the two years' period after she had left, and it is entirely probable that a refusal on his part to make further payments for her support away from him would have occasioned her return. That, in my judgment, he did not want.

"Each month his letters were being sent to her enclosing his remittances, and in no letter was there any word in any way indicating a desire to be relieved from those payments and for her to share his household as his wife, much less any indication on his part that if she would come back or if she did come back she would be received as his wife.

"She, on the other hand, testifies that on at least one occasion she wrote him a letter which, if written in the form that she states, was a clear enough indication to him that she wished to come back and would come back if he would express but a faint desire that she should come. That letter, he claims, did not contain the specific expressions in the form that Mrs. Mayhew has testified to them, and what the truth may be it is difficult to determine with entire certainty.

But on at least one occasion the doctor saw her personally at her home in Atlantic City, and he does not claim that while there he made any suggestion to her that he would like her to return or would be willing that she should return or that if she would return he would make any effort to render her home pleasant for her, or accord her the privileges due to a wife. Indeed, I think he says that on one occasion he told her that if she did return to him—in response to her suggestion touching her return—that it would be necessary for him to make a home elsewhere than Wildwood on account of the publicity that had been given to their affairs; that suggestion, to say the very least, was not calculated to induce her return and was obviously not so intended.

"Now, in view of those circumstances, can it be said to be susceptible of doubt as a fact that Mrs. Mayhew's attitude throughout has been exactly what she says, especially since the trial of the maintenance suit, namely, a willingness to return to her husband if he desired it, or if he should in the faintest manner invite it? It seems to me impossible to conclude that since the trial of that maintenance suit there has been any time—and possibly at no time before—when, had Doctor Mayhew approached his wife in anything like the spirit that a husband does approach a wife when he desires her return, and said to her in a proper manner that he wished her to return, or even that he was willing for her to return, or that should she return to him he would treat her as a wife should be treated—I say, it is impossible for me to conclude that in such circumstances she would not have returned to him, I am sure she would not have refused to return—I cannot doubt it—and I think the testimony, and especially the attitude of the parties on the witness-stand, impels that conclusion.

"On the other hand, I think the testimony impels the conclusion that Doctor Mayhew has not desired her return, and has studiously avoided encouraging her return. It may be that both he and his wife have had a false pride; that he did not want to admit even by possible inference that he had

done anything wrong or had been in the slightest degree in fault, as any advances on his part from his standpoint might have been by him thought to imply. It may be that he has occupied the attitude that many married people do occupy toward each other, an attitude where they seem to shrink from making any concessions at all; a false pride, which is the most foolish thing in the world and which leads to endless troubles, and it is quite possible that both he and she have shrunk from apparent humiliation to the other in making any proffers or advances of reconciliation.

"My firm belief is, however, that had the doctor in the slightest degree indicated to his wife that he wanted her back or that he was willing to take her back she would have responded immediately, and I believe that he also entertained that very view. So far as the obstinacy of the desertion is concerned—determination upon the part of Mrs. Mayhew to resist any reasonable effort upon the part of her husband to procure her return—I do not believe that has existed in her mind at any time, and I think that the reason no effort has been made to procure her return upon the part of the doctor has either been through false pride on his part or through a desire on his part to be rid of her—a desire to prolong the desertion for two years—probably the latter.

"It may be better for these parties if they were divorced, but that is a matter which the legislature must provide for; a court must accept the law of divorce as the legislature makes it. The statute says that unless this desertion has been obstinate for a period of two years there can be no dissolution of the marriage on the ground of desertion.

"My judgment is and my belief is that the element of obstinacy is wholly wanting in this case. The notion that an effort on the part of the doctor to procure his wife's return would have been futile, or even that he had any reason to think so, is clearly in conflict with the fact. His failure to invite her return was, in my judgment, due to his desire that she should prolong her desertion the full period of two years. I will so find and advise a decree dismissing the petition."

*Mr. William Harris,* for the petitioner-appellant.

*Messrs. Cole & Cole,* for the defendant-respondent.

PER CURIAM.

The decree will be affirmed, for the reasons stated in the opinion delivered by Vice-Chancellor Leaming in the court of chancery.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, HEPPENHEIMER, GARDNER, ACKERSON, VAN BUSKIRK, CLARK —13.

*For reversal*—None.